## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IMMEDIATE APPLIANCE SERVICE, INC., on behalf of itself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>RB GLOBAL, INC., ROUSE SERVICES LLC, ROUSE ANALYTICS LLC, UNITED RENTALS, INC., UNITED RENTALS (NORTH AMERICA), INC., HERC HOLDINGS, INC., HERC RENTALS INC., SUNBELT RENTALS, INC., H&E EQUIPMENT SERVICES INC., SUNSTATE EQUIPMENT CO., LLC, and THE HOME DEPOT, INC.,<br><br>*Defendants.* | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Immediate Appliance Service, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated, upon personal knowledge as to the facts pertaining to it and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint against the above-captioned defendants RB Global, Inc. ("RB Global"); Rouse Services LLC and Rouse Analytics LLC (together "Rouse"); United Rentals, Inc. and United Rentals (North America), Inc. (together, "United"); Sunbelt Rentals, Inc. ("Sunbelt"); Herc Holdings Inc. and Herc Rentals Inc., (together, "Herc"); H&E Equipment Services Inc. ("H&E"); Sunstate Equipment Co., LLC ("Sunstate"); and The Home Depot, Inc. ("Home Depot") (together the "Defendants") for violations of federal antitrust and common laws.

## I.    NATURE OF THE ACTION

1.    This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize rental prices for various pieces of rental equipment and tools used for construction, manufacturing, entertainment, and other industries ("Rental Equipment") from at least as early as March 31, 2021, until Defendants' unlawful conduct and its anticompetitive effects cease to persist. ("Class Period").

2.    Defendants United, Sunbelt, Herc, H&E, Sunstate, and Home Depot (together referred to as "Rental Firm Defendants") are several of the largest providers in the Rental Equipment market in the United States and worldwide. Indeed, just two Defendants, United and Sunbelt, made up nearly 60% of the market in 2023.

3.    Defendants RB Global and Rouse (the "Rouse Defendants") are the owners and operators of Rouse Services, a platform that collects, analyzes, and disseminates detailed and current information on Rental Equipment prices, utilization, and fleet age across the United States. Rouse Services provides various products and services to the Rental Firm Defendants and other rental equipment providers who subscribe to the service, such as market reports, benchmarking tools, valuation services, and fleet management software.

4.    As part of their services, the Rouse Defendants collect and distribute confidential and competitively sensitive data from the Rental Firm Defendants and other rental equipment providers. Specifically, the Rouse Defendants collect invoice-level transaction data and nightly fleet snapshots from participating rental companies, including the Rental Firm Defendants, and report—on a daily basis—industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age, and other key performance metrics.

5.      Rouse markets its services as a way for the Rental Firm Defendants and other rental equipment providers to compare and optimize their rental and utilization rates. But in reality, it's a mechanism used to effectuate an unlawful price-fixing conspiracy.

6.      Through Rouse Services, the Rouse Defendants facilitate and enable an unlawful conspiracy among the Rental Firm Defendants and other rental equipment providers to fix, raise, maintain, and/or stabilize Rental Equipment rental prices across the United States.

7.      The scheme has been incredibly successful. During the Class Period, the Rental Firm Defendants have experienced record profits, and their share prices have skyrocketed. Executives for the Rental Firm Defendants have chalked up their success to a "disciplined" market, which is actually a euphemism for a market in which the Rental Firm Defendants have agreed to eliminate price competition, thus allowing them to reap the benefits of higher prices and margins.

8.      This lack of competition has been to the detriment of Plaintiff and members of the Class (defined below) and has caused them to pay supracompetitive prices for Rental Equipment during the Class Period. Plaintiff brings this class action Complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act and violations of common law.

## II.    JURISDICTION AND VENUE

9.      **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.     **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District. Moreover, Defendant RB Global is headquartered in this District.

3

11.     **Venue.** Venue in this District is proper as Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Class members in this District.

12.     **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States.

### III.   PARTIES

#### 1.  Plaintiff

13.     Plaintiff Immediate Appliance Service, Inc. is an appliance sales and repair services company based in New Jersey. During the Class Period, Immediate Appliance Service rented Rental Equipment from one or more of the Defendants. As a result of Defendants' anticompetitive practices, Immediate Appliance Service paid higher prices to rent Rental Equipment.

#### 2.  Rouse Defendants

14.     Defendant RB Global, Inc. is a public company incorporated in Canada with its principal place of business in Westchester, Illinois.

15.     Rouse Services LLC is a subsidiary of RB Global, Inc. Rouse Services is incorporated and headquartered in Beverly Hills, California.

16.     Rouse Analytics LLC is a subsidiary of RB Global, Inc. Rouse Analytics is incorporated and headquartered in Beverly Hills, California.

17.     Rouse provides analytical and benchmarking services to the largest equipment rental companies in North America.

### 3. United Defendants

18.     United Rentals, Inc. is a public company incorporated in Delaware with its principal place of business in Stamford, Connecticut.

19.     United Rentals (North America), Inc. is a wholly owned subsidiary of United Rentals, Inc. United Rentals (North America), Inc. is incorporated in Delaware with its principal place of business in Stamford, Connecticut.

20.     United is the largest equipment rental company in the world and in North America. United operates in nearly every state, Puerto Rico, and most of Canada.

### 4. Sunbelt

21.     Sunbelt Rentals Inc is a private company incorporated in North Carolina with its principal place of business in Fort Mill, South Carolina. Sunbelt is the North American division of Ashtead Group PLC, Sunbelt's parent company which is based in London.

22.     Sunbelt is the second largest rental company in the world and in North America. Sunbelt has over 1,200 locations across North America.

### 5. Herc Defendants

23.     Defendant Herc Holdings Inc. is a public company incorporated in Delaware with its principal place of business in Bonita Springs, Florida.

24.     Defendant Herc Rentals Inc. is a wholly owned subsidiary of Herc Holdings. Herc Rentals Inc. is incorporated in Delaware with its principal place of business in Bonita Springs, Florida.

25.     Herc is the third largest rental company in the world and in North America. Herc has over 400 locations across North America.

### 6. H&E

26.     H&E Equipment Services Inc. is a private company incorporated in Delaware with its principal place of business in Baton Rouge, Louisiana.

27.     H&E is among the largest rental companies in North America, with approximately 160 locations in over 30 states.

28.     In January 2025, United and H&E announced that they entered into a definitive agreement under which United will acquire H&E. In February 2025, it was announced that United dropped the deal after Herc outbid United's offer during H&E's "go-shop" period. Herc's acquisition of H&E is expected to close mid-year 2025.

### 7. Sunstate Equipment

29.     Sunstate Equipment Co., LLC is a private company incorporated in Delaware with its principal place of business in Phoenix, Arizona. Sunstate is a subsidiary of the Japanese conglomerate, Sumitomo Corporation.

30.     Sunstate is among the largest rental companies in North America, with approximately 160 locations in over 30 states.

### 8. The Home Depot

31.     Home Depot, Inc. is a public company incorporated in Delaware with its principal place of business in Atlanta, Georgia.

32.     The Home Depot is the world's largest home improvement retailer. It provides several services, including tool and equipment rental and home improvement installation services. In addition, Home Depot sells a wide range of building materials, home improvement products, lawn and garden products, décor products, and facilities maintenance, repair and operations products. As of 2023, Home Depot operated 2,335 stores located throughout the U.S.

and its territories (including the Commonwealth of Puerto Rico and the territories of the U.S. Virgin Islands and Guam), Canada, and Mexico.

### 9. Unnamed Co-conspirators and Other Non-Parties

33.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

34.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

35.     Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Rental Equipment Market

36.     The Rental Equipment industry provides temporary access to a wide variety of equipment used across construction, industrial, entertainment, and residential projects. Examples of Rental Equipment rented out by the Rental Firm Defendants include:

- Aerial elevated work platforms, such as scissor lifts and boom lifts;

- Air compressors and other air tools;

- Earth moving machines, such as backhoes and excavators;

- Forklifts;

- Generators and generator accessories;

7

- Pumps, such as water pumps and trash pumps; and

- Various other pieces of tools and equipment, including lighting equipment and plumbing equipment.

37.    This important industry allows businesses and individuals to rent machinery and tools rather than purchasing them, offering cost efficiency, flexibility, and access to specialized equipment. Companies in this industry, including the Rental Firm Defendants, serve a broad range of customers, including construction firms, manufacturing plants, municipalities, and homeowners.

38.    North America has the largest rental market in the world. In North America and, indeed, worldwide, the Rental Firm Defendants dominate the market. In fact, in 2023, the Rental Firm Defendants made up over 80% of the market in terms of revenue. Two Defendants, United and Sunbelt, made up nearly 60% of the market.



**Figure 1.[1]**

39.     The Rental Equipment market has generally experienced consistent growth over the last decade. Such growth has been driven by increasing construction activity, infrastructure investments, and a rising preference for renting over ownership.

40.     There are several reasons why customers of the Rental Firm Defendants prefer renting equipment over buying. For one, renting equipment reduces costs incurred in maintaining and storing pieces of equipment. Additionally, renting equipment eliminates unnecessary purchases, as a company can choose the specific equipment they need depending on each project.

41.     During the Class Period, revenues in the Rental Equipment market have steadily increased year-over-year (aside from 2020 when the COVID-19 pandemic paused most business

---

[1] https://www.internationalrentalnews.com/news/trendlines-rental-dominance/8040110.article?zephr_sso_ott=MTReoz

activity). Indeed, the top three Rental Equipment companies—United, Sunbelt, and Herc—have seen record revenue growth in recent years.



Source: S&P Global Market Intelligence, ARA Rentalytics

**Figure 2.**[2]

42.     Additionally, prices for Rental Equipment have risen sharply during the Class Period. As shown below, the FRED (Federal Reserve Economic Data) published Producer Price Index for Construction Equipment Rental and Leasing reveals significant price increases during

---

[2] https://news.ararental.org/equipment-rental-industry-remains-resilient

the Class Period. This index measures changes in revenue received by companies that rent and lease construction machinery and equipment.[3]



**Figure 3.**[4]

43.    From 2021 through 2024, U.S. Rental Equipment prices have climbed markedly each year, with year-over-year rental rate increases on the order of 5-10+% among the Rental Firm Defendants.

44.    While Defendants may attribute price increases to external factors, as alleged below, such price increases were actually facilitated by Defendants' anticompetitive scheme.

**B.    Anticompetitive Conduct**

45.    During the Class Period, rental equipment providers, including the Rental Firm Defendants, coordinated with each other to systematically increase the rental prices of Rental Equipment by exchanging, purchasing, and relying on competitively sensitive business information provided by the Rouse Defendants.

---

[3] https://www.bls.gov/ppi/factsheets/new-producer-price-index-for-the-construction-mining-and-forestry-machinery-and-equipment-rental-and-leasing-industry-naics-532412.htm

[4] FRED, "Producer Price Index by Industry: Other Heavy Machinery Rental and Leasing: Construction Equipment Rental and Leasing," https://fred.stlouisfed.org/series/PCU532412532412121#.

### 1. History of Rouse

46.     Rouse was founded in 1920 as an auction and liquidation firm with a focus on construction equipment. Since 2000, Rouse has transitioned to an information services company for the construction industry.

47.     The transition to information services began with Rouse providing equipment appraisals ("Rouse Appraisals"). Rouse Appraisals provide equipment appraisals for a variety of equipment, including general rental construction equipment, heavy earth moving equipment, material handling equipment, cranes, tractors and trailers, and various specialty products. Rouse advertises that its appraisals are "unmatched" in "accuracy, reliability, and speed" because it has "such a vast pool of data." Rouse claims it has "the world's most comprehensive data on construction equipment," including "$115 [billion] in equipment fleet value tracked, $49 [billion] in rental revenue tracked, [and] $52 [billion] in sales transaction data evaluated annually."[5]

---

[5] https://www.rouseservices.com/solutions/appraisals/#



**Figure 4.[6]**

48.     In or around 2010, Rouse began offering analytics to its customers ("Rouse Analytics"). Rouse Analytics provides analytical and benchmarking services to the largest equipment rental companies in North America. Today, Rouse Analytics advertises that it ingests nightly data on more than $60 billion worth of construction equipment and delivers market intelligence to its customers, including the Rental Firm Defendants.

49.     In October 2011, Rouse Analytics launched its "Rental Metrics Benchmark Service"—today called "Rouse Rental Insights"[7]—which provides rental companies with a comparison of their own key performance metrics relative to the performance metrics of the industry.

50.     When it announced the new service, Rouse Analytics also announced the initial participants in the service. These initial participants included several of the Rental Firm Defendants, including United, Herc, and H&E.

---

[6] https://www.rouseservices.com/solutions/rental-insights/

[7] "Rouse Rental Insights" will be used in this Complaint to refer to Rouse's benchmark services.

13

51.     As Rouse Analytics added additional rental providers to its service, it was keen to publicize this fact to alert other market participants that Rouse Analytics was carrying their data. For instance, in February 2015, Rouse Analytics announced that over 50 Rental Equipment companies were using its service, now including Rental Firm Defendant Sunstate as well as Rental Equipment provider, Ahern Rentals—Ahern was acquired by United in 2022 for $2 billion.

52.     By 2019, Rouse publicized that its client base grew to over 150 companies, including Rental Firm Defendant Sunbelt, the second largest provider in the United States.

53.     Today, Rouse publicizes that 400 rental companies across North America use Rouse Rental Insights, including all of the Rental Firm Defendants.

54.     In December 2020, Rouse was acquired by Ritchie Bros., the world's largest equipment auction company for approximately $275 million. Together, the companies hold a vast amount of data about all facets of the Rental Equipment industry, and the merger gave Rouse access to new data feeds and customer relationships. Around the time of the acquisition, Ann Fandozzi, CEO of Ritchie Bros., touted the combination as "complementary" and acknowledged it would "accelerate both of our growth efforts by providing customers more robust data."[8] As Ritchie Bros. publicized in a May 2022 presentation to investors, "Ritchie Bros. has essentially become one of Rouse's largest data providers." [9]

55.     In May 2023, Ritchie Bros. changed its corporate name to RB Global following the acquisition of IAA, Inc., a digital marketplace for buying and selling vehicles.

---

[8] https://www.monitordaily.com/news-posts/ritchie-bros-completes-acquisition-of-rouse-services/
[9] Ritchie Bros., "Investor Day May 2022" Presentation.

### 2. Rouse Rental Insights

56.     Launched in 2011, Rouse Rental Insights collects invoice-level transaction data and nightly fleet snapshots from participating rental companies—including the Rental Company Defendants—and reports industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age, and other key performance metrics at a local market level to each of its subscribers, including the Rental Company Defendants.

57.     As soon as it launched Rouse Rental Insights in 2011, Rouse advertised to Rental Equipment companies, such as the Rental Firm Defendants, that they could use its service to maximize prices by gaining an insight into their competitors' pricing:

> [Rouse Rental Insights] provides rental companies . . . with a comparison of their own key performance metrics relative to the aggregated performance metrics of the industry.
>
> The service reports on rental rates, physical utilization, dollar utilization, fleet age, and revenue per day metrics. The service also reports on rental rate change over time and revenue distribution (i.e., % of revenue derived from monthly, weekly, and daily rentals, and ancillary fees). These metrics are reported on a total company, regional, and market level for over 50 major categories and almost 400 types of equipment.[10]

58.     The service allows Rental Equipment companies, such as the Rental Firm Defendants, to maximize their prices by matching the "benchmarks" Rouse calculates based on the nightly transaction data it receives. These benchmarks measure where a Rental Equipment company stands in relation to its competitors in the market on monthly, weekly, and daily rates for a variety of product types.

---

[10] https://web.archive.org/web/20161207180032/https://www.businesswire.com/news/home/201110240059
80/en/Rouse-Analytics-Launches-Rental-Metrics-Benchmark-Service

59.     Rouse advertises that its benchmarks are "based on actual rental invoices sent to customers – not quoted or list rates." By using actual rental invoices, Rouse touts that it "delivers the accuracy [Rental Equipment companies] need to make the best, ***most profitable*** decisions."[11]

60.     During a 2020 webinar, Phil Mause, who at the time was the Managing Director of Rouse Analytics, walked through how Rouse's customers can use its benchmarks to fix prices.

61.     During the webinar, Mause gave a demonstration that revealed the granular data points that Rouse uses to compare the rates its customers charge versus their competitors. Mause used a hypothetical crane rental company for the demonstration.

---

[11] https://www.point-of-rental.com/rouse-and-smartequip-provide-your-total-one-stop-shop-for-equipment-lifecycle-management/#:~:text=Editor's%20Note:%20This%20blog%20was,for%20used%20equipment%20lifecycle%20management.

62. For instance, Mause showed how the hypothetical company could have made approximately $33,000 more in December 2019 had it charged the Rouse benchmark rates across all of its equipment categories, which were calculated based on competitors' confidential, non-public data:



**Figure 5.**[12]

63. Later, he showed how the company compared to its competitors across the various local markets in which it competes. In the New Orleans-Baton Rouge market, for instance, Rouse calculated that the company's revenue rate was 2.2% below its competition:

---

[12] Webinar, "Using Technology to Optimize Your Fleet and Equipment Rental Business with Rouse Analytics."

| | Regions | Districts | Branches | |
|---|---|---|---|---|
| | | Client Compared Revenue | | Client Rate vs Benchmark |
| New Orleans-Bat... | | $931,063 | | ($20,731) / -2.2% |
| Houston-Port Art... | | $861,911 | | ($68,802) / -7.4% |
| Michigan | | $380,505 | | ($57,963) / -13.2% |
| Southern Alabama | | $308,988 | | ($15,084) / -4.7% |
| Oklahoma City-T... | | $288,085 | | $17,261 / 6.4% |
| Western Kentuck... | | $266,567 | | $5,356 / 2.1% |
| Dallas-Ft Worth | | $252,102 | | $25,334 / 11.2% |
| Birmingham | | $208,624 | | $4,318 / 2.1% |
| Gulfport-Mobile | | $194,786 | | $18,625 / 10.6% |
| Kansas City-Tope... | | $170,950 | | $12,172 / 7.7% |
| All Branches » | | | | |

**Figure 6.**[13]

64.     Finally, he showed that the customer could drill down by each product to see how its prices for that product compared to its competition. For 50-54 Ton Rough Terrain Cranes, the hypothetical company's revenues were 1.2% (-$161,730) below its competitors:

---

[13] Webinar, "Using Technology to Optimize Your Fleet and Equipment Rental Business with Rouse Analytics".



**Figure 7.**[14]

65.     Only Rental Equipment companies can participate in Rouse Rental Insights because, to utilize the service, Rental Equipment companies must agree to regularly provide their current transaction data to Rouse. Rental Equipment companies provide Rouse with their transaction data by allowing Rouse to connect directly to their enterprise software system.

---

[14] Webinar, "Using Technology to Optimize Your Fleet and Equipment Rental Business with Rouse Analytics".



**Figure 8.**[15]

66.     As shown above, Rouse Rental Insights provides Rental Equipment companies, including the Rental Firm Defendants, with current, non-public, competitively sensitive information: namely rental rates, physical utilization, dollar utilization, fleet age, revenue per day metrics, and benchmarks. This is information that the Rental Firm Defendants would never have in a competitive market but for Rouse. The information exchange is the essential component of the conspiracy to artificially inflate rental prices for Rental Equipment.

---

[15] Webinar, "Using Technology to Optimize Your Fleet and Equipment Rental Business with Rouse Analytics".

### 3. Defendants Agree to Exchange Current, Non-Public, Competitively Sensitive Information through Rouse and Artificially Increase Rental Prices for Rental Equipment

67.     Through Rouse Rental Insights, each Rental Firm Defendant knows that the other Rental Firm Defendants, as well as Unnamed Co-Conspirators, are also providing current, non-public, competitively sensitive information about their Rental Equipment transactions to Rouse, which would then be shared by Rouse with its subscribers, including the Rental Firm Defendants. Knowing that their competitors would share such information reciprocally, Defendants were certain that their conspiracy would be effective.

68.     Rouse advertises who uses Rouse Rental Insights. For instance, in 2024, Rouse announced on its website that nine of the top ten largest rental companies in North America use Rouse Rental Insights, including the top three companies: United, Sunbelt, and Herc.[16] Additionally, in a marketing slide deck from 2024, Rouse lists all 355 U.S. Companies who use Rouse Rental Insights. By publishing this information, Rouse communicates to the Rental Firm Defendants who else purchases the reports, thus giving additional assurances to each Defendant that its competitors were also part of the conspiracy. A snippet of the slide is provided below as Figure 5. The slide includes all the Rental Firm Defendants.



**Figure 9.[17]**

---

[16] https://www.rouseservices.com/rouse-smartequip-clients-dominate-top-rental-company-lists/

[17] Rouse Analytics, Slide Deck, "Rental Rate & Utilization Benchmark Reporting" (2024).

69.     Not long after launching, Gary McCardle, who, at the time, was the executive vice president and chief operating officer at Rouse, explained how Rental Equipment companies could use the Rouse Rental Insights benchmarks to fix prices:

> So let's say here, in the Sacramento market, Company X is doing $3.9 million on revenue on transactions Rouse can compare and it looks like Company X could have earned $4.02 million just by reaching the benchmark. So Company X is 2-percent down and $89,000 is the opportunity in that market just by bringing rates up to the average. Physical utilization is 72 percent but the benchmark in the market is 75 percent. And you can measure this per month, per year or any time period you want.[18]

70.     Participants in the industry have stated that "Rouse has essentially standardized a lot of the price competition in the industry," and, "*[s]ince [Rouse's] involvement, rates have significantly increased*."[19]

71.     Josh Nickell, a former executive in the industry, who subsequently sold his business to Defendant Sunbelt, stated in an interview that, with Rouse, the "larger rental companies [including the Rental Firm Defendants] . . . have become more stable in their pricing and show a desire to increase prices."[20] Nickell also noted that national rental companies like the Rental Firm Defendants aim to stay within Rouse's benchmarks for their various categories of Rental Equipment: "They usually have goals to remain above or at the average, depending on their position."[21]

72.     Executives of the Rental Firm Defendants themselves have commented that Rouse allows them to institute price increases.

---

[18] https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service

[19] https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition

[20] https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition

[21] https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition

73.     For instance, Bradely Barber, CEO of H&E, said during a 2022 earnings call that "I think [H&E's pricing] is right in line with any of the other firms doing high-quality business." He mentioned how Rouse supports "discipline" among his competitors: "We use a lot of information that's supported by Rouse . . . and we are comfortable that our pricing is well aligned. And I would comment that the amount of discipline we continue to see, particularly among most of our larger public peers [*i.e.* United, Herc], is very encouraging."[22]

74.     Similarly, at a Goldman Sachs conference in May 2023, Herc CEO, Larry Silber remarked that "the market is accepting price increases that are being put forth." When an analyst asked if Rouse was impacting this dynamic, Herc CFO Mark Humphrey's echoed the discipline that Barber mentioned: "[Rouse] is probably one of the biggest differences [between then and now]. You have . . . 50% to 60% of North American rental companies reporting into Rouse, and we see that data weekly and then more rolled up monthly. And that certainly goes to the discipline in the overall marketplace."

75.     Finally, at a September 2024 Morgan Stanley conference, United CEO Matthew Flannery made a similar admission: "The industry is so much more disciplined . . . . ***Rouse analytics has been part of it. We have data now that helps***."

76.     By exchanging non-public, competitively sensitive information through Rouse, Defendants have been able to artificially increase Rental Equipment rental prices throughout the United States.

---

[22] H&E Q1 2022 Earnings Call Transcript, https://www.fool.com/earnings/call-transcripts/2022/04/27/he-equipment-services-hees-q1-2022-earnings-call-t/.

### 4. Defendants' Systematic Exchange of Competitively Sensitive Information via the Rouse Reports Violates Section 1 of the Sherman Act

77.     Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act.

78.     In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies. In subsequent years, the agencies used this safety zone as a general guideline for the legality of information exchanges in other industries.

79.     The 1996 Policy was recently withdrawn by the DOJ. But while it was operative, to qualify for the safety zone, the information exchange would have had to meet the following requirements:

- The information exchange was managed by a third-party, like a trade association or government agency;

- the information provided by participants was relatively old (e.g. more than three months old); and

- the information was aggregated to protect the identity of the underlying sources, and enough sources were aggregated to prevent competitors from linking particular data to an individual source.

80.     The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

81.     DOJ has recently demonstrated a renewed focus on prosecuting anticompetitive information sharing. As a result, on February 3, 2023, DOJ withdrew three antitrust policy statements, including the 1996 Policy discussed above. Critically, when announcing the withdrawal, DOJ said that "the statements *are overly permissive on certain subjects, such as information sharing, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant . . . competition issues in today's environment*."

82.     The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

83.     Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

84.     Expanding further, at the 2024 American Bar Association Antitrust Spring Meeting, DOJ antitrust division attorney Kathleen Kiernan stated that "information may be a couple of years old" and still run afoul of antitrust laws forbidding anticompetitive information exchanges. She emphasized that "DOJ looks at the nature of information exchanged and the age of the information . . . there's not a one-size-fits-all approach to ensuring information exchanges have 'absolutely no concern' for antitrust enforcers."[23]

85.     Later in 2024, DOJ filed a Statement of Interest in *In re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), where it reiterated its stance against anticompetitive information exchanges. In the Statement, DOJ stated that it filed the Statement to make clear that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[24]

---

[23] Chris May, "Exchanges of 'years-old' labor market data still create antitrust risk, US DOJ official says," mLex (April 11, 2024), *available at* https://content.mlex.com/#/content/1555754/exchanges-of-years-old-labor-market-data-still-create-antitrust-risk-us-doj-official-says.

[24] *In Re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), Dkt. 2616.

86.     DOJ's position has not changed during the current Administration. In March 2025, Ryan Tansey, the section chief of the DOJ antitrust division's Washington Criminal Section, said at a conference "If I make no other point today, I just want to be very clear that that is not correct. . . . Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny."[25]

87.     That same month, DOJ submitted a Statement of Interest in *In re Multipan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.) (Kennelly, J.), in which it stated that "[c]oncerted action is conduct that joins together separate decisionmakers and thus deprives the marketplace of independent centers of decisionmaking. . . . Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, ***to the joint delegation of decisionmaking power to a common agent***."[26] (emphasis added; internal quotations and citations omitted).

88.     Considering DOJ's position that information exchanges can be anticompetitive regardless of their exact form, Defendants' information exchange violates Section 1 of the Sherman Act.  Defendants' information exchange existed for the purpose of "depriv[ing] the marketplace of independent centers of decisionmaking,"[27]  increasing Rental Equipment rental prices above competitive levels, and maintaining those supracompetitive prices.

---

[25] Chris May, "Outsourced pricing doesn't 'skirt' antitrust liability, US DOJ official says," mLex (March 11, 2025), *available at* https://content.mlex.com/#/content/1637762/outsourced-pricing-doesn-t-skirt-antitrust-liability-us-doj-official-says?referrer=portfolio_openrelatedcontent.

[26] *In re Multipan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), Dkt. 382.

[27] *Id.*

5.  **"Plus Factors" in the Rental Equipment Industry Provide
    Additional Evidence of a Conspiracy**

89.     Prominent legal and economic antitrust scholars studying collusive behavior have

identified certain "plus factors," which are "economic actions and outcomes, above and beyond

parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but

largely consistent with explicitly coordinated action," and therefore support an inference of

collusion.[28] Each plus factor that is present constitutes a piece of circumstantial evidence

supporting active collusion, as opposed to mere conscious parallelism. The factors that provide

the most probative value and lead to a strong inference of explicit collusion are referred to as

"super plus factors."[29]

90.     Here, several plus and super plus factors support the plausible inference that

Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants'

exchange of competitively sensitive information; (2) the presence of a price-verification scheme;

(3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly

concentrated market; and (6) high barriers to entry.

91.     ***First***, the reciprocal sharing of firm-specific competitively sensitive information

that would normally remain private is a "super plus factor" that leads to a strong inference of

active collusion.[30] As described above, Defendant Rouse collects invoice-level transaction data

and nightly fleet snapshots from participating rental companies and reports industry benchmarks

for rental rates, physical utilization, dollar utilization, fleet age, and other key performance

metrics at a local market level. These benchmarks measure where a Rental Equipment

---

[28] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

[29] *See id.* at 396-97.

[30] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

company stands in relation to others in their market on monthly, weekly, and daily rates for a variety of product types. Rental Equipment companies, such as the Rental Firm Defendants, are able to maximize their prices by matching the benchmarks Rouse calculates based on the nightly transaction data it receives. The data Rouse uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively-sensitive nature. Because a Rental Equipment company would be competitively disadvantaged by sharing private data unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors.

92. **Second,** Rouse provides participating Rental Equipment companies with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[31] With Rouse Rental Insights, Rental Equipment companies, including the Rental Firm Defendants, are able to see benchmarks that measure where a Rental Equipment company stands in relation to others in their market on monthly, weekly, and daily rates for a variety of product types. These benchmarks are based on actual transactions. This type of price-verification makes little sense absent collusion.

93. **Third,** Rouse provides Rental Equipment companies, including the Rental Firm Defendants, with a motive to conspire by advertising that Rouse Rental Insights provides valuable information to support maximizing profits.

94. **Fourth,** as of October 2020, Defendants United, Sunbelt, Herc, H&E, and Sunstate, are all members of the American Rental Association ("ARA"). ARA is the largest international trade association for owners of equipment and event rental operations and manufacturers and suppliers of rental equipment. Additionally, ARA organizes numerous

---

[31] *Id.* at 1601.

industry meetings and events throughout the year, including The ARA Show—the world's largest equipment and event rental industry trade show. At the 2025 ARA Show, Defendants, including Sunbelt, Sunstate, Herc, and United, were in attendance.[32] Trade association membership and events provide Defendants additional opportunities to collude.

95. **Fifth,** the Rental Equipment market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large, Rental Equipment companies, including the Rental Firm Defendants, have been growing through acquisitions. In fact, in 2023, the Rental Firm Defendants made up over 80% of the market in terms of revenue. Two Defendants, United and Sunbelt made up nearly 60% of the market. Further consolidation is on the horizon, as Herc recently announced it was acquiring H&E—Herc has made 51 acquisitions over the past four years. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

96. **Sixth**, Rental Equipment companies face significant entry barriers. These include the high cost of acquiring expensive equipment as well as ongoing costs of maintenance and storage. Thus, new entrants into the market are unlikely to discipline cartel pricing.

## V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

97. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among the Rental Firm Defendants has been restrained or eliminated with respect to Rental Equipment rent prices;

- The rate (price) of Rental Equipment rentals has been fixed, stabilized, or maintained at artificially high levels; and

- Individuals have been deprived of free and open competition.

---

[32] https://news.ararental.org/workforce-development-day-at-the-ara-show-hits-the-jackpot

98. Defendants' violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for renting Rental Equipment than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of overcharges paid on their Rental Equipment rentals. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

99. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiff defines such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

## A. The Relevant Product Market Is Rental Equipment

100. To the extent a relevant product market needs to be defined in this action, it is the market for Rental Equipment.

101. There are no reasonable substitutes for Rental Equipment.

102. Renting equipment offers several benefits over purchasing equipment that are unique. For instance, users prefer to rent equipment to avoid high upfront costs. Additionally, renting equipment ensures users will not be responsible for repair, maintenance, and storage costs. Renting heavy machinery like trucks and cranes is especially cost-effective because these machines are only used sparingly in most projects. Storage costs and services for large construction equipment may be too expensive for users to sustain in the short and long term.

103. For these reasons, the Rental Equipment market is a discrete market.

**B. The Relevant Geographic Market Is National**

104.    Should a geographic market need to be defined in this action, it is the United States. The Rental Firm Defendants rent equipment through locations across the United States and have increased rental prices universally.

105.    In the alternative, a regional submarket exists for every individual market covered by Rouse Rental Insights. Rouse requires at least five participating companies to be able to adequately cover a market. Upon information and belief, Rouse covers at least 35 regional markets in the United States.

## VI.   CLASS ALLEGATIONS

106.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who rented Rental Equipment from a Rental Firm Defendant at any time during the period of March 31, 2021 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

107.    The following persons and entities are excluded from the above-described proposed Class:

- Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

- All governmental entities;

- All Counsel of Record; and

- The Court, Court personnel, and any member of their immediate families.

108.    The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members because such information is presently in the exclusive

control of Defendants. Plaintiff believes that due to the nature of the industry there are likely, at a minimum, hundreds of thousands of Class members in the United States and its territories.

109.    Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

- Whether Defendants exchanged competitively sensitive information;

- Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rental prices for Rental Equipment;

- The duration of the conspiracy alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

- Whether such combination or conspiracy violated the federal antitrust laws;

- Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiff and other members of the Class;

- Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on Rental Equipment rental prices;

- The appropriate class-wide measure of damages; and

- The nature of appropriate injunctive relief to restore competition in the Rental Equipment market.

110. Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for Rental Equipment.

111. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

112. Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

113. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

114. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

115.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.  CAUSES OF ACTION

### COUNT 1

**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

116.     Plaintiff repeats the allegations set forth in Paragraphs 1-115, above, as if fully set forth herein.

117.     Beginning at a time currently unknown to Plaintiff, but at least as early as March 31, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

118.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rental prices they charge for Rental Equipment and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

119.     Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Rental Equipment.

120.     Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to Rental Equipment;

- The prices of Rental Equipment rents have been fixed, stabilized, or maintained at artificially high levels; and

- Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

121. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

122. Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

### Information Exchange in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

123. Plaintiff repeats the allegations set forth in Paragraphs 1-115, above, as if fully set forth herein.

124. Beginning at a time currently unknown to Plaintiff, but at least as early as March 31, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

125. The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

36

126.     Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Rental Equipment.

127.     This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

128.     Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

### COUNT 3

**Unjust Enrichment**
**(Against All Rental Firm Defendants)**

129.     Plaintiff repeats the allegations set forth in Paragraphs 1-115, above, as if fully set forth herein.

130.     Alternatively, from the acts of Defendants as alleged above, the Rental Firm Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

131.     Through Defendants' systematic exchange of competitively sensitive non-public information, the Rental Firm Defendants have artificially increased the rental price of Rental Equipment charged to Plaintiff and members of the Class.

132.     The Rental Firm Defendants have collected from Plaintiff and members of the Class artificially high rents for Rental Equipment.

133.     The Rental Firm Defendants have been unjustly enriched by retaining the artificially high rents for Rental Equipment collected from Plaintiff and members of the Class.

134.    The retention of these rents by the Rental Firm Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks this Court for the following:

A.   The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.   The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.   The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect,

and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.  The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E.  The Court grant Plaintiff and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Rental Firm Defendants' unjust enrichment;

F.  The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G.  The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

39

Dated: April 16, 2025

                                  Respectfully submitted,

                                  By:  */s/ Adam J. Levitt*
                                  Adam J. Levitt (ARDC No. 06216433)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice* forthcoming)
Alexander E. Barnett (*pro hac vice* forthcoming)
Geralyn J. Trujillo (*pro hac vice* forthcoming)
Carrie Syme (*pro hac vice* forthcoming)
Jonathan S. Crevier (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
gtrujillo@dicellolevitt.com
csyme@dicellolevitt.com
jcrevier@dicellolevitt.com

Alexander H. Schmidt (*pro hac vice* forthcoming)
**ALEXANDER H. SCHMIDT, ESQ**.
Fairways Professional Plaza
5 Professional Circle, Ste. 204
Colts Neck, New Jersey 07722
(732) 226-0004
alex@alexschmidt.law

***Attorneys for Plaintiff and the Proposed Class***